Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 2450 | **DATE** | 3/30/2001 |
| **CASE TITLE** | Doyle, et al. vs. Camelot Care Center | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion to dismiss (Doc. No. 15-1) is granted. Leave is granted to file an amended complaint within twenty-one (21) days.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | *3* number of notices | |
| ✓ | Notices mailed by judge's staff. | | MAR 30 2001 date docketed | Document Number |
| | Notified counsel by telephone. | | docketing deputy initials | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | 3/30/2001 date mailed notice | |
| | Copy to judge/magistrate judge. | | | |
| ETV | courtroom deputy's initials | | ETV | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ELIZABETH DOYLE; YOUNGSOOK NAMKOONG, <br><br> Plaintiffs. <br><br> v. <br><br> CAMELOT CARE CENTERS, INC., a Delaware corporation; JESS McDONALD, director of the Illinois Department of Children and Family Services ("DCFS"), in his individual capacity; EDWARD COTTON, director of the Division of Child Protection ("DCP") for DCFS, in his individual capacity; MATTHEW FRANKLIN, head of the DCFS Administrative Hearing Unit, in his individual capacity; LINDA EVERETTE-WILLIAMS, head of the DCFS's State Central Register, in her individual capacity; MICHAEL MALONEY, formerly a DCFS licensing supervisor, in his individual capacity; JOSEPH BECERRA, a DCP supervisor, in his individual capacity; MARILYN O'LEARY, a DCP supervisor, in her individual capacity; PEGGY EVERLING, an acting DCP supervisor, in her individual capacity, TONI McWILLIAMS, a DCP investigator, in her individual capacity; LINDER HARRINGTON, a DCP investigator in her individual capacity, <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) No. 00 C 2450<br>)<br>)<br>) Judge<br>) Rebecca R. Pallmeyer<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

DOCKETED

MAR 30 2001

## MEMORANDUM OPINION AND ORDER

Plaintiffs Elizabeth Doyle and Youngsook Namkoong (collectively "Plaintiffs"), two

child care professionals, bring this action seeking compensatory and punitive damages against

their former employer, Camelot Care Centers ("Camelot"), and various officials and

employees of the Illinois Department of Children and Family Services ("DCFS" or "State

Defendants") in their individual capacities.[1] Plaintiffs allege that State Defendants and Camelot violated their right to due process when they indicated Plaintiffs as guilty of neglect based on a low evidentiary standard, terminated them based on that indicated report, and effectively blacklisted them from working with children until the reports were later expunged. Plaintiffs also claim that Defendants failed to give them formal notice of the indicated report, gave them only redacted investigative files, and failed to hold a prompt hearing to appeal the indicated findings. The State Defendants now move to dismiss the suit against them, contending that it is barred by the Eleventh Amendment and that, even if it is not, they are shielded from liability by absolute or qualified immunity. Camelot also moves to dismiss the action against it, claiming that it is not a state actor for purposes of §1983 and that it did not deprive Plaintiffs of any constitutional right when it terminated them. For the following reasons, Defendants' motions to dismiss are granted.

## FACTUAL BACKGROUND

Defendant Camelot Care Centers ("Camelot"), a for-profit child welfare agency incorporated in Delaware, operates child welfare programs in a number of states, including Illinois. (Complaint ¶¶ 1, 10.) In Illinois, Camelot is a "Purchase of Service" ("POS") agency,

---

[1]     Specifically, Plaintiffs have named: Jess McDonald, Director of DCFS; Edward Cotton, Deputy Director of DCFS and Director of the Division for Child Protection ("DCP"); Matthew Franklin, Chief Administrative Law Judge for DCFS and head of its Administrative Hearing Unit; Linda Everette-Williams, Administrator of the State Central Register; Michael Maloney, a licencing supervisor with DCFS; Joseph Becerra, Marilyn O'Leary, and Peggy Everling, DCP supervisors; and Toni McWilliams and Linder Harrington, DCP investigators. (Cmplt. ¶¶ 11-17.)

that is, an agency with which the Illinois Department of Children and Family Services ("DCFS") contracts to perform various state functions in connection with DCFS's duties, such as the care of state wards. (*Id.* ¶ 1.) DCFS meets the full cost of caring for and treating all the wards enrolled in Camelot's foster care program. (*Id.* ¶ 38.)

In May of 1998, Plaintiffs Elizabeth Doyle and Youngsook Namkoong worked for Camelot in its therapeutic foster care program. (*Id.* ¶¶ 2, 8, 9, 39.) At that time, Plaintiffs were indicated by DCFS as perpetrators of neglect of a child in their care and were terminated from their positions. (*Id.* ¶¶ 2, 56-57.) The events leading up to the decision to indicate Plaintiffs as perpetrators of neglect were as follows:

In December of 1997, K.F. was enrolled in Camelot's therapeutic foster care program. (*Id.* ¶¶ 3(a), 42.) On December 17 or December 18, 1997, K.F. took an overdose of Tylenol and had to be hospitalized for four days. (*Id.* ¶ 3(b).) On January 8, 1998, K.F.'s boyfriend, Kurt Anderson, called the DCFS Child Abuse Hotline and reported that K.F. had taken the overdose both because of her foster parents and because of Doyle's neglect of K.F. (*Id.*)[2]

---

[2]     Plaintiff's complaint goes into great detail concerning the events leading up to K.F.'s overdose, including an explanation that shortly before K.F. took the overdose and before Anderson called the DCFS hotline, Camelot had forbidden K.F. and Anderson from seeing one another. (Cmplt. ¶ 3(a).) In addition, the complaint alleges that on December 17, 1997, Kurt Anderson called Doyle to report that he had reason to believe that K.F. was overdosing. (*Id.* ¶ 44.) In response to this call, Doyle spoke with both K.F. and K.F.'s foster parents to make sure that she was fine. (*Id.* ¶ 45.) Doyle then called Camelot's clinical director, Leslie Smebakken, who determined, based on Doyle's information, that K.F. did not require any immediate medical care. (*Id.* ¶ 46.) Smebakken arranged for Plaintiff Namkoong to pick K.F. up the next morning and take her to school, presumably as an extra precaution to ascertain that K.F. was in no danger. (*Id.* ¶ 46-47.) Many of these details may
(continued...)

After Anderson's call to the Hotline, DCFS line investigators Toni McWilliams and Linder Harrington investigated the circumstances leading to K.F.'s overdose. (*Id.* ¶¶ 3.b., 53.) Based on their investigation, and employing the standard of whether "credible evidence" existed to indicate Plaintiffs of neglect, McWilliams and Harrington recommended to their supervisors that Doyle and Namkoong be indicated for "medical neglect" and "substantial risk of physical injury" of K.F. (*Id.* ¶¶ 3(b), 54.) The supervisors, Joseph Becerra, Marilyn O'Leary and Peggy Everling, approved the findings. (*Id.*)[3]

DCFS failed to send Plaintiffs formal written notification of the indicated report. Doyle learned through her own attorney on May 6, 1998, that she had been indicated for neglect of K.F. (*Id.* ¶¶ 55, 61(a).)[4] On May 6, 1998, Doyle spoke with her supervisor, Sue Roselle, at Camelot and informed Roselle of DCFS' decision to indicate her. (*Id.* ¶ 55.) Roselle, in turn, spoke to DCFS Licensing Supervisor Michael Maloney on at least two

_____

[2](...continued)
well be relevant to the ultimate determination of whether Plaintiffs should have been indicated for this neglect. Nevertheless, because this motion to dismiss focuses on the narrower question of whether Plaintiffs have alleged a constitutional deprivation for which Defendants can be held liable, the court has omitted many of the details concerning Plaintiffs' response to K.F.'s overdose in this opinion.

[3]    Plaintiffs do not state specifically what each individual supervisor did. Instead, they explain that the supervisors "participated in the investigation" by issuing "instructions to enforce DCFS policy, or by [approving] . . . the actions of or recommendations of the investigators." (Cmplt. ¶ 53.) In addition, Plaintiffs explain that the McWilliams' recommendation was signed by Becerra. (*Id.* ¶ 54.)

[4]    Doyle does not explain how her attorney received the information about the indicated report, nor does she explain whether that attorney was retained in regard to these charges. Namkoong found out about the report several days later from Camelot when it terminated her. (Cmplt. ¶ 57.)

separate occasions the next day. (*Id.*) According to Roselle, Maloney advised Camelot that it could no longer employ Doyle because of the indicated report. (*Id.*) Roselle terminated Doyle on May 8, 1998, and terminated Namkoong on May 11, 1998, after she returned from an approved vacation. (*Id.* ¶¶ 56, 57.)

Once DCFS investigators decide that credible evidence of abuse or neglect exists, it maintains a record of that so-called "indicated" finding in the State Central Register. (*Id.* ¶ 3(b).) That finding will also stand as the final administrative determination unless the indicated person is successful in overturning the finding in the administrative appeals process. (*Id.*) In Plaintiff's case, the indicated report was not formally registered until May 18, 1998. (*Id.* ¶ 60.) According to Plaintiffs, the State Defendants did not afford them any written notice of the indicated report against them, nor were they given any opportunity to be heard by a neutral decision maker to contest the finding or their termination prior to the issuance of the report. (*Id.* ¶¶ 3(d), 61(a).) Camelot also did not afford them any hearing before terminating them. (*Id.*)

Plaintiffs allege that "DCFS has long had in effect policies that discouraged or effectively prohibited child care employers from continuing to employ any child care employee who had been registered as guilty in an indicated report" and that Camelot has developed and enforced policies that parallel some DCFS policies. (*Id.* ¶ 59.) These policies include, in most cases: "suspending, terminating, or taking other adverse employment action against any [Camelot] employees (in child contact positions) immediately upon being notified by DCFS that the employee is under investigation for child abuse or neglect, or has been

registered as guilty in an indicated report." (*Id.* ¶ 32(a).) In addition, Camelot does not make an independent assessment of whether the facts and circumstances giving rise to the investigation and/or indicated report warrant the investigations, the report, or the adverse action before taking action against the employee, nor does it afford its employees any hearing either prior to or after the adverse action. (*Id.* ¶ 32(a)(b).)

Nearly eight months after the indicated report was entered into the State Central Register, each Plaintiff was afforded an administrative hearing to challenge the indicated findings against her. (*Id.* ¶ 61(c)(ii).) Plaintiffs allege that, before this time, they received redacted case files that made it difficult for them to comprehend the charges against them. (*Id.* ¶ 61(b).) They also allege that some of the evidence which was relied on in the administrative appeals process was withheld from them. (*Id.*)

Namkoong's administrative hearing, which began on January 19, 1999, ended in a settlement on July 22, 1999. (*Id.* ¶ 61(c)(ii).) As part of the settlement, the Department expunged the indicated report, effective May 18, 2000. (*Id.* ¶ 61(c)(ii).) Doyle was afforded an administrative hearing on January 27, 1999. (*Id.* ¶ 61(c)(i).) The hearing was adjourned on numerous occasions by DCFS and did not conclude until May 6, 1999. (*Id.*) On August 13, 1999, the administrative law judge issued a recommended decision denying Doyle's request to expunge the indicated finding against her. (*Id.* ¶ 61(c)(i). Doyle appealed the final administrative decision to the Kane County Circuit Court, and, on March 13, 2000, Doyle's indicated report was expunged by agreed order. (*Id.*)

According to Plaintiffs, before hiring a new employee, "virtually all child care

employers (because they are licensed by DCFS, because they have contracts with DCFS, or for other reasons) are required to check or do check the [Central State Register] for indicated reports as part of a routine background checking process" and that "DCFS policies . . . strongly discourage or effectively prohibit these [agencies] from hiring anyone" after a background check exposes either a pending investigation or an indicated report. (*Id.* ¶ 31(g).)

Alleging they were unable to obtain acceptable substitute employment until the records against them were expunged, Plaintiffs filed this complaint on April 24, 2000, seeking compensatory and punitive damages from all named Defendants.[5]

**DISCUSSION**

A.    **Standard of Review**

In deciding a motion to dismiss for failure to state a claim, the court considers the allegations in the complaint to be true and views all well-pleaded facts and any reasonable inferences drawn from the facts in the light most favorable to the plaintiff. *See Leatherman v. Tarrant County Narcotics & Intelligence Unit*, 507 U.S. 163, 164-65 (1993); *Stachon v. United*

---

[5]    Significantly, though Plaintiffs explain in their complaint how State Defendants McWilliams, Harrington, Becerra, O'Leary, Everling and Maloney became personally involved in this suit, they do not explain what actions McDonald, Cotton, Franklin or Everette-Williams took. Plaintiffs only state that Jess McDonald, as DCFS director, and Edward Cotton, as the DCFS Deputy Director and Director of the Division for Child Protection ("DCP") are responsible for Department policies and for investigations, findings of abuse and neglect, and maintaining such findings in a State Central Register. (Cmplt ¶¶ 11-12.) Plaintiffs also explain that Franklin, as head of the Administrative Hearing Unit ("AHU") is responsible for scheduling and conducting appeal proceedings and Everette-Williams records and maintains the indicated reports in the State Central Register and is responsible for sending notice to persons named as guilty in indicated reports. (*Id.* ¶¶ 13-14.)

*Consumers Club, Inc.*, 229 F.3d 673, 675 (7th Cir.2000). Dismissal is proper under 12(b)(6) if

the Plaintiff can establish no set of facts upon which relief can be granted. *See Henson v. CSC*

*Credit Servs.*, 29 F.3d 280, 284 (7th Cir.1994). In addition, the Seventh Circuit has stated that

the question of whether an immunity exists, "it is a question that should be resolved as

promptly as possible." *Shaikh v. City of Chicago*, No. 00 C 4235, 2001 WL 123784, at *7

(N.D. Ill. Feb. 13, 2001) (citing *Harrell v. Cook*, 169 F.3d 428, 431 (7th Cir. 1999)). Once a

public official raises the defense of qualified immunity, the plaintiff bears the burden of proof

on the issue. *Erwin v. Daley,* 92 F.3d 521, 525 (7th Cir.1996).

## B.    Official and Personal Capacity

As an initial matter, the State Defendants argue that "[t]his action is a thinly veiled

complaint seeking monetary damages against the State of Illinois" and, therefore, is barred by

the Eleventh Amendment. (State Defendants' Memorandum of Law in Support of their

Motion to Dismiss Plaintiffs' Complaint Pursuant to FED. R. CIV. P. 12(b) (hereinafter "State

Defs.' Brief") at 5.).[6] According to Defendants, because "each individual Defendant was acting

pursuant to State law or department policy" and, in fact, "Plaintiffs do not argue that . . . the

actions undertaken by the State Defendants in this case were anything other than in their

official capacities," the named State Defendants can only be sued in their official, not personal

---

[6]    Defendants also contend that "Plaintiffs are adequately represented in *Dupuy v. McDonald*, No. 97 C 4199 (N.D. Ill., filed June 1997) (Pallmeyer, J.), an official capacity lawsuit before this [c]ourt, where the statewide policies of the Department are being challenged." (State Defs.' Brief, at 5.) Plaintiffs are indeed part of the *Dupuy* class action, a suit which seeks to enjoin and reform certain DCFS policies relevant to this lawsuit. That fact by itself does not bar Plaintiffs from bringing this suit for monetary damages.

capacity. (*Id.* at 6.)

The State Defendants are correct that, if this were an official capacity suit against DCFS policies and customs, and not against any personal acts taken by the State Defendants, it would be barred by the Eleventh Amendment. It is well settled that the Eleventh Amendment bars a suit by a private party against a state without its consent. *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267-268, 117 S.Ct. 2028 (1997) (citing *Hans v. Louisiana*, 134 U.S. 1 (1890)); *see also, In re Platter*, 140 F.3d 676, 678 (7th Cir. 1998). The Eleventh Amendment also bars a citizen from suing a state agency or a state official in her official capacity in federal court, unless the state consents to suit in federal court or Congress has abrogated the state's immunity. *See In re Platter*, 140 F.3d at 678; *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114 (1996); *see also Gossmeyer v. McDonald*, 128 F.3d 481, 495 (7th Cir. 1997). Thus, if Plaintiffs are alleging only that they were harmed by the policies and procedures of the state, and not by any personal actions of the State Defendants, this suit would be barred by the Eleventh Amendment.

Indeed, in *Konold v. Central Baptist Children's Home and Family Servs.*, No. 00-CV-0377, slip op. at 7 (S.D. Ill. Mar. 21, 2001), Judge Herndon, deciding claims almost identical to the ones before this court, found that the claims brought against DCFS officials in their individual capacities, actually alleged official capacity claims. As the court explained, "Konald has not alleged facts within the body of his complaint that show how any of the defendants are liable in an individual capacity. Rather, with each allegation against the DCFS Defendants, Konold seeks redress from DCFS policy and Illinois law." *Id.* The court

therefore found that the claims against the DCFS defendants were barred by the Eleventh Amendment.

This court understands and acknowledges the reasoning in *Konold*, and ultimately finds, as did the *Konold* court, that this suit must be dismissed against all Defendants. The court concludes, however, that this case is not barred by the Eleventh Amendment because Plaintiffs have chosen to plead their case as an individual capacity case. As the Seventh Circuit has explained, "the 'capacity' in which litigation proceeds is largely the plaintiff's choice." *Walker v. Rowe*, 791 F.2d 507, 508 (7th Cir. 1986); *see also, Duckworth v. Franzen*, 780 F.2d 645, 651 (7th Cir. 1985), *abrogated on other grounds* as noted in *Haley v. Gross*, 86 F.3d 630, 644 (7th Cir.1996) ("the plaintiff is the master of the complaint"). The Supreme Court has been equally clear that the distinction between official and personal capacity suits turns on the capacity in which state officials are sued, not on the capacity in which they acted when injuring the plaintiff. *See Hafer v. Melo*, 502 U.S. 21, 27 (1991) (whereas official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent," personal capacity suits "seek to impose personal liability upon a government official for actions he takes under color of state law"); *see also Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); Erwin Chemerinsky, FEDERAL JURISDICTION, §7.5.2 (3d Ed. 1999). Thus,

> [i]f you believe that a state officer has violated your constitutional rights, you have a choice between suing the officer personally and suing the state. If you go the former route you don't have to worry about the Eleventh Amendment but do have to worry about various personal defenses, such as good-faith immunity; if you go the latter route you don't have to worry about personal

defenses but may have to worry about the Eleventh Amendment.

*Duckworth*, 780 F.2d at 649; *see also Walker*, 791 F.2d at 508 (though plaintiff may plead a claim either way, "if he pleads what is naturally an official capacity suit as an individual capacity suit, he avoids the eleventh amendment problem but confronts a fatal problem – inability to prove personal responsibility").

A plaintiff is, thus, free to plead an official capacity suit as an individual capacity suit – for example, by alleging that a government official is individually liable for carrying out government policy. Such a claim is not likely to succeed, however, for other reasons: "[M]ost provisions of the bill of rights do not forbid simple neglect . . . and the constitution does not make supervisory officeholders vicariously liable for the acts and omissions of their subordinates." *Walker*, 791 F.2d at 508. Such a theory will fail, not because of the Eleventh Amendment, but because the plaintiff will not be able to prove her case. *Duckworth*, 780 F.2d at 650.

In fact, there are circumstances in which a government official may be sued in her individual capacity for official actions. For example, in *Hafer*, shortly after Barbara Hafer became the Auditor General of Pennsylvania, she discharged a number of employees on the basis that they "bought" their jobs from a former employee. *Id.* at 23. The terminated employees claimed that they were discharged because of their political party affiliation and brought suit against Hafer in her personal capacity, seeking, *inter alia*, monetary damages for the alleged wrongful termination. *Id.* In finding that the personal capacity suit against Hafer was not barred by the 11th Amendment, the Court rejected Hafer's argument that officials

should only be subject to personal liability when they act outside their authority or when they perform acts not essential to the operation of state government. *Id.* at 27-28. As the Court explained:

> The distinction . . . finds no support in the broad language of §1983. To the contrary, it ignores our holding that Congress enacted §1983 to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it.

*Id.* at 28. In addition, the court pointed out that if officials could not be held personally liable for official actions, they would, in effect, have absolute immunity for official acts, something which the court has never extended to officers. *Id.* at 28-29.

Thus, Plaintiffs here may sue the State Defendants for their official acts. In order to state a claim upon which relief can be granted, however, they must be prepared to show that Defendants personally violated their rights and were not merely the supervisors of those who violated their rights, nor merely negligent in those violations. *See e.g., Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 477 (7th Cir. 1997); *Salley v. Schmitz*, No. 94 C 3448, 1997 WL 403680 at *4 (N.D. Ill. Jul 14, 1997). Construing the allegations of the complaint liberally, the court concludes Plaintiffs have alleged personal involvement by each State Defendant in a deprivation of Plaintiffs' constitutional rights. Furthermore, Plaintiffs have alleged at least certain deprivations, such as the failure to receive notice of their indicated report and the failure to have a hearing scheduled within thirty days of their notice, that are clearly not attacks merely on DCFS policy, because, in fact, these acts were contrary to the relevant DCFS policy at the time they were taken. *See e.g.,* 325 ILCS 5/7.16 (1994) (hearings "shall

be held within a reasonable time after the subject's request); ILL. ADMIN. CODE tit. 89 §336.110(d)(1)(1996) ("The Administrator of the Administrative Hearing Unit shall schedule the hearing at a date within 30 calendar days of the date [of] the appellant's written notice stating that the [issue was not resolved] to the appellant's satisfaction.); ILL. ADMIN. CODE tit. 89 §336.70(a) ( "[s]ubjects have the right to receive a timely written notice of Department decisions as to whether a child abuse or neglect report is 'indicated' or 'unfounded'.")

Thus, the court will determine the merits of the individual capacity claims against the State Defendants. In turn, these Defendants will be entitled to assert personal immunity defenses that would not be available to them in an official capacity suit. *See e.g., Hafer*, 502 U.S. at 25 ("officials sued in their personal capacities, unlike those sued in their official capacities, may assert personal immunity defenses such as objectively reasonable reliance on existing law"). Before the court turns to the immunity defenses available to the State Defendants, it first considers whether Plaintiffs have alleged an actionable constitutional violation with respect to all Defendants.

C.     **Procedural Due Process**

In analyzing procedural due process claims, "the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law." *Brokaw v. Mercer County*, 235 F.3d 1000, 1020 (7th Cir. 2000). Thus, a procedural due process claim must always involve a two part analysis: First, the court must determine whether the defendants deprived a plaintiff of a protected liberty or property

13

interest. *See id.* (citing *Hamlin v. Vaudenberg*, 95 F.3d 580, 584 (7th Cir. 1996)). If the first inquiry "yields an affirmative response," the court must then assess what process is due before the plaintiff can be deprived of that protected interest. *Id.*

### 1.    Constitutional Deprivation

Plaintiffs allege that due to the indicated finding of neglect, they were deprived not only of their jobs at Camelot, but were also deprived of any opportunity for future employment in child care until the time that the indicated report was expunged. (Cmplt. ¶ 64.) Because Plaintiffs do not allege that they were anything but at-will employees of a private employer, they have implicated no property interest in their employment. *See e.g., Board of Regents v. Roth*, 408 U.S. 564, 577 (1972) (a non-tenured faculty member whose contract had not been renewed had no property rights in his employment requiring due process); *see also Flynn v. Kornwolf*, 83 F.3d 924, 926 (7th Cir. 1996)) ("[e]mployment at will, in which the employee has no property interest, is the rule.") The court finds, however, that Plaintiffs' allegation that the State Defendants effectively barred them from being hired in any capacity as a child care worker does implicate a constitutional deprivation that requires due process.

### a.    State Defendants

It is well-settled law that damage to a person's reputation alone is not sufficient to implicate a federal liberty interest. *See Paul v. Davis*, 424 U.S. 693 (1976). A plaintiff can, however, show that a protected liberty interest was infringed is she can establish that the injury to her reputation was "publicly disclosed and that this public disclosure caused the

subject a tangible loss of other employment opportunities." *Lewis v. Dep't of Children & Family Serv..*, No. 93 C 2908, 1994 WL 270265, at *2 (N.D. Ill. June 15, 1994) The court finds that Plaintiffs have done just that.

Plaintiffs allege that once their names were added to the State Central Register as individuals who were found indicated of neglect of a child in their care, they were effectively barred from employment in child care, their chosen profession. According to Plaintiffs, "before hiring a new employee, virtually all child care employers (because they are licenced by DCFS, because they have contracts with DCFS, or for other reasons) are required to check or do check the [State Central Register] for indicated reports as part of a routine background checking process." (Cmplt. ¶ 31(g).) Additionally, Plaintiffs allege that "DCFS policies . . . strongly discourage or effectively prohibit these [agencies] from hiring anyone" after a background check exposes either a pending investigation or an indicated report. *Id.* Thus, Plaintiffs have sufficiently alleged that the State Defendants infringed their constitutionally protected liberty interest in future employment. *See also Valmonte v. Bane*, 18 F.3d 992, 1002 (2d Cir. 1994) (holding that plaintiff "adequately stated a cause of action for deprivation of a liberty interest not merely because of the defamatory aspect of the Central Register," but because that defamation occurred in conjunction with an impediment to employment); *see also Cavarretta v. Department of Children & Family Svcs.*, 277 Ill. App. 3d 16, 660 N.E.2d 250 (2d Dist. 1996) (same). Plaintiffs have, therefore, shown that at least some of the State Defendants deprived them of a constitutionally protected liberty interest.

### b.    Camelot and State Defendant Michael Maloney

Although Plaintiffs have adequately stated a constitutional deprivation with respect to the State Defendants, they have not alleged any such deprivation with respect to Defendant Camelot. As has already been explained, Plaintiffs, both at-will employees, have alleged no property interest in their continued employment at Camelot. The decision to terminate either Plaintiff from her position at Camelot, therefore, standing on its own, does not constitute a constitutional deprivation.

Plaintiffs argue, however, that in the process of discharging them, Camelot deprived them of a liberty interest. To support its position, Plaintiff points to *Fittshur v. Village of Menomonee Falls*, 31 F.3d 1401, 1405 (7th Cir. 1994). In *Fittshur*, the Seventh Circuit explained that "if, in the process of discharging [an employee]," the government "publicly charged him with immorality, dishonesty, or the like, or otherwise stigmatized him in a way that foreclosed future employment opportunities" a plaintiff has implicated a liberty interest that requires due process. A closer look at *Fittshur*, however, supports dismissing Defendant Camelot from this suit.

In *Fittshur*, the plaintiff was working for the Village in early 1989 when he was accused by local residents of having profited from "inside knowledge" on a real estate venture. *Id.* These allegations were then published in the local newspaper. *Id.* After Fittshur refused to refrain from engaging in any real estate transaction in the Village, the Village discharged Fittshur from his position. *Id.* at 1404. After the termination, rumors began to circulate that Fittshur had been discharged for conducting personal real estate transactions on Village time.

16

*Id.* at 1404, 1409-10. According to Fittshur, these rumors were the reason he could not find another job. *Id.* He therefore brought suit against the Village, claiming that the Village had deprived him of a liberty interest in pursuing future employment by its actions. *Id.*

The Seventh Circuit, after finding that Fittshur did not possess a property interest in his job, found that, though Fittshur had a liberty interest in pursuing his occupation, that interest was not affected when the Village terminated him. *Id.* at 1405-1409. As the court explained, it was not enough for Fittshur to contend that he lost employment opportunities due to rumors where Fittshur could not show that the rumors had been started by the Village and, in fact, much of the information contained in the rumors had been published by the local newspaper. *Id.* at 1409. In addition, where Fittshur could not produce any evidence that his former supervisor or others in his office were informing future employers about the circumstances behind his termination, the fact that he had applied for so many jobs without getting any offers could not be a basis for determining that the Village violated his liberty right to future employment. *Id.* at 1410-1411.

Similarly, Plaintiffs do not allege that their termination from Camelot barred them from future employment. Instead, Plaintiffs allege that the State Defendants' decision to indicate them for neglect, and to publish that finding in the State Central Register, effectively precluded them from obtaining work in their field. Plaintiffs do not allege that Defendant Camelot itself circulated the finding of the indicated report or prevented them from obtaining future employment. Thus, Defendant Camelot did not deprive plaintiffs of a constitutional right when it terminated them.

Failing in this first argument, Plaintiff contends that Defendant Camelot cannot escape liability by arguing that it only participated in part of the action that resulted in a deprivation of Plaintiffs' constitutional rights. As Plaintiffs explain, it was a combination of factors -- being indicated for neglect, placed in the State Central Register and being terminated from their job -- that deprived them of their liberty interest and, therefore, Camelot should not be allowed to escape liability by claiming that it was only involved in part of that deprivation.

Again, the court cannot agree. There is no evidence that Camelot's termination of Plaintiffs, standing alone, affected their ability to get future employment. Instead, as Plaintiffs themselves allege, it was the indicated report that stood as a barrier to future employment. It is true, as Plaintiffs suggest, that "a plaintiff can recover against any defendant so long as there is some causal connection or affirmative link between the action complained about and the official sued," *see* Plaintiff's Memo, at 5 (citing *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995), but here the action complained about -- the indicated report barring future employment -- was not caused by Camelot's termination. Future employment is typically affected by the normal stigma that attaches to being terminated, but that stigma is not enough to infringe an "employee's liberty interest." *Lashbrook v. Oerkfitz*, 65 F.3d 1339, 1348-48 (7th Cir. 1995). Instead, only circumstances that make it "virtually impossible for the employee to find new employment in that field" rise to the level of implicating a liberty interest. Camelot's termination of Plaintiffs did not rise to

that level and, as such, Camelot must be dismissed from this suit.[7]

For similar reasons, Defendant Michael Maloney must be dismissed from this suit. The only claim that Plaintiffs allege against Maloney is that he "advised Camelot that it could no longer employ Doyle because of the indicated report." (Cmplt. ¶ 55.) Because the court has found that the termination did not amount to a constitutional deprivation, Maloney must be dismissed along with Camelot. In addition, the court notes that Plaintiffs themselves allege that Camelot's own policies called for: "suspending, terminating, or taking other adverse employment action against any [Camelot] employees (in child contact positions) immediately upon being notified by DCFS that the employee is under investigation for child abuse or neglect, or has been registered as guilty in an indicated report." (*Id.* ¶ 32(a).) Because, according to Plaintiffs' own allegations, Camelot would have terminated Plaintiffs under its policies no matter what Maloney may have said to Camelot officials, Maloney cannot be held personally liable for Camelot's decision to terminate Plaintiffs. *See e.g., De Mauro v. Loren-Maltese*, No. 98 C 8318, 2000 WL 116079, at *13 (N.D. Ill. Jan. 24 2000) (citing *Conner v. Reinhard*, 847 F.2d 384, 396-97 (7th Cir. 1988)) (only officials who cause a citizen to be deprived of his or her constitutional rights can be held liable under §1983).

### c.  Defendants Jess McDonald and Edward Cotton

Before addressing the State Defendants' defense of immunity, the court turns to the

---

[7]     Because this court finds that Defendant Camelot has not been involved in a constitutional deprivation, it need not decide whether or not Camelot, a private non-profit organization, is a state actor under §1983.

claims against Jess McDonald, the Director of DCFS, and Edward Cotton, the Deputy Director of DCFS, to determine if either personally deprived Plaintiffs of any constitutional rights. Notably, though Plaintiffs submit a lengthy and detailed complaint, they do not clearly state what actions either McDonald or Cotton personally engaged in that violated Plaintiffs' rights. Instead, Plaintiffs merely allege that "McDonald is responsible for . . . the development, . . . maintenance, and enforcement of all Department policies," and Cotton is "responsible for the development, maintenance and enforcement of all policies that DCP pursues." (Complaint ¶ 11-12.)

The fact that McDonald and Cotton are the final supervisors of each of the named State defendants is not sufficient to hold them liable under §1983. It is well settled that the doctrine of respondeat superior cannot be used to impose §1983 liability on a supervisor for the conduct of a subordinate violating a plaintiff's constitutional rights. *See e.g., Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, at 477 (7th Cir. 1997). This court therefore assumes that Plaintiffs are attempting to hold McDonald and Cotton personally responsible for formulating DCFS policies and customs that violated Plaintiff's constitutional rights. *See e.g., De Maura v. Loren-Maltese*, No. 98 C 8318, 2000 WL 116079, at \*13 (N.D. Ill. Jan. 24 2000) (if the defendant "set in motion a series of events" that the defendant knew or should reasonably have known would cause others to deprive the plaintiff of his or her constitutional rights, the defendant can be held liable under §1983). These violations include the following: (1) Plaintiffs were terminated from their employment; (2) they were indicated using a credible evidence standard and that indicated finding was put on the State Central

Register and used to bar them from future employment in the field of child care; (3) they were not given a prompt hearing or a pre-deprivation hearing; and (4) they were not given notice of the indicated findings so they could not understand all the charges against them.

As has already been discussed, the fact that Plaintiffs were terminated from their employment does not state a constitutional deprivation. As for the next claim, that Plaintiffs were indicated based on the credible evidence standard, to the extent that McDonald and Cotton caused Plaintiffs to be investigated and indicated for neglect based on a credible evidence standard, they are entitled to qualified immunity from this claim. *See infra* Section C(2)(b) (complete discussion of the defense of qualified immunity defense).

The next two claims, that Plaintiffs were not given a prompt hearing and that they were not given notice of the indicated findings against them, do not state any §1983 claims against McDonald and Cotton.[8] As has been explained, McDonald and Cotton can only be held liable under §1983 if Plaintiffs can show that they caused the deprivation of Plaintiffs' rights. Plaintiffs cannot show any causal connection between McDonald's and Cotton's

---

[8]    Nor does the fact that Plaintiffs were not given a pre-deprivation hearing state a constitutional violation. It is well established that, when dealing with the life and health of children, the government may "take away liberty with [a] post-deprivation hearing." *See, e.g., Browkaw*, 235 F.3d at 1021 (citing *Jordan v. Jackson*, 15 F.3d 333, 343 (4th Cir.1994). In this case, Plaintiffs were working with a number of different children in Camelot's program, including the child that they were indicated for neglecting. Because Plaintiffs would continue to work with children until the report was indicated, as would anyone suspected of abuse or neglect, this court cannot say that State Defendants should not be allowed to indicate them first, or otherwise give notice of the potential of neglect, and then afford a hearing afterwards. Plaintiffs are, of course, still entitled to a prompt *post*-deprivation hearing. *See Browkaw*, 235 F.3d at 1021 (citing *Donald v. Polk County*, 836 F.2d 376, 380 (7th Cir.1988)).

actions and these deprivations, however. Plaintiffs allege that they did not receive prompt hearings, but the relevant regulations enforced and maintained by the State Defendants at the time the events took place direct otherwise: the regulations require that "[the hearing] shall be held within a reasonable time after the subject's request." 325 ILCS 5/7.16 (1994). In addition, the Illinois Administrative Code at the time provided that: "The Administrator of the Administrative Hearing Unit shall . . . schedule the hearing at a date within 30 calendar days of the date [of] the appellant's written notice stating that the" issue was not resolved "to the appellant's satisfaction." Exhibit A, State Defs.' Memo, ILL. ADMIN. CODE tit. 89 §336.110(d)(1)(1996). Similarly, Plaintiffs allege they did not receive formal notice of their indicated report, but the relevant regulations stated: "[s]ubjects have the right to receive a timely written notice of Department decisions as to whether a child abuse or neglect report is 'indicated' or 'unfounded'." Id. ILL. ADMIN. CODE tit. 89 §336.70(a).

Plaintiffs allege that they did not receive a timely notice and were not afforded a prompt hearing. Defendants McDonald and Cotton are not responsible for these failures. They have developed and maintained policies both to give those indicated of abuse or neglect a prompt hearing and to give them notice of the deprivation. Barring any allegation that they personally caused the delay in Plaintiffs' hearing or were involved in failing to send out any notice, therefore, they cannot be liable under §1983 for actions that violated their own guidelines.

### D.    Immunities

Defendants contend that even if this suit is not barred by the Eleventh Amendment, they are entitled to immunity. The court agrees that State Defendants McDonald, Cotton, Becerra, O'Leary, Everling, McWilliams and Harrington, are entitled to qualified immunity and that State Defendant Franklin is entitled to absolute immunity.

### 1.    Absolute Immunity

In determining whether a government official is entitled to absolute immunity, the court applies a functional approach, looking at "the nature of the function performed, not the identity of the actor who performed it." *Wilson v. Kelkhoff*, 86 F.3d 1438, 1443 (7th Cir. 1996) (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)). Absolute immunity is only accorded for limited functions; "[t]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Id.* (citing *Burns v. Reed*, 500 U.S. 478, 486-87 (1991)). Thus, the official seeking the benefit of immunity bears the burden of proving that it is justified. *Id.*

Defendants contend, and the court agrees, that Franklin, the Chief Administrative Law Judge and head of its Administrative Hearing Unit ("AHU") is entitled to absolute immunity. Plaintiffs allege that as head of the AHU, Franklin is "responsible for scheduling and conducting appeal proceedings." (Complaint ¶ 13.) Plaintiffs do not, however, explain what actions Franklin took personally that deprived Plaintiffs of a constitutional right. Reading the complaint in the light most favorable to the Plaintiff, however, the court will assume that Franklin, and not one of his subordinates, failed to schedule a timely hearing.

It is well established that judges are afforded absolute immunity acting in their judicial capacities. *See, e.g., Forrester v. White*, 484 U.S. 219, 225 (1988); *Stump v. Sparkman*, 435 U.S. 349 (1978). It is equally well established that absolute immunity is afforded to administrative law judges in their judicial capacities. *See Cleavinger v. Saxner*, 474 U.S. 193, 200 (1985) ("There can be little doubt that the role of the modern federal hearing examiner or administrative law judge . . . is 'functionally comparable' to that of a judge" and as such, administrative law judges are entitled to absolute immunity.); *Butz v. Economou*, 438 U.S. 478, 512-13 (1978) ("the conflicts which federal hearing examiners seek to resolve are every bit as fractious as those which come to court"). The only question for this court to determine, therefore, is whether the act of scheduling a hearing is a judicial function protected by absolute immunity.

In *Thompson v. Duke*, 882 F.2d 1180, 1180 (7th Cir. 1989), the plaintiff brought a §1983 action against various state defendants, alleging that their failure to schedule and conduct a timely parole violation hearing constituted a deprivation of his constitutionally protected liberty interests. Though Thompson agreed that the defendants generally enjoyed absolute immunity for adjudicating parole hearings, he argued that failing to schedule a hearing was a purely "administrative" as opposed to "adjudicatory" function that should not be accorded absolute immunity. *Id.* at 1183. The Seventh Circuit disagreed. *Id.* at 1184. As the court explained, "scheduling a case for hearing is part of the routine procedure in any litigated matter. However, the fact that the activity is routine or requires no adjudicatory skill renders that activity no less a judicial function." *Id.* Because the court found that

scheduling a hearing "is obviously an integral judicial (or quasi-judicial) function," the defendants were entitled to absolute immunity for such scheduling. *Id.*

Similarly, Franklin should be accorded absolute immunity for failing to schedule a prompt hearing. In an effort to defeat this claim of absolute immunity, Plaintiffs contend (in their brief, without any mention of it in their complaint) that Franklin was not the ALJ in either Plaintiff's case and, therefore, was not acting in his judicial capacity when he scheduled the hearing. By the same logic, a deputy clerk scheduling a hearing for a judge would not be accorded absolute immunity for failing to schedule a timely hearing. This court knows of no case law to support this novel proposition.

In addition, because Plaintiffs have not alleged anything to the contrary, this court assumes that Plaintiffs are alleging that Franklin's failure to schedule such hearing amounted to negligence on his part. Thus, even were he not protected by absolute immunity, Plaintiffs have not stated a cognizable §1983 claim against him. *See, e.g. Pena v. Leombruni*, 200 F.3d 1031, 1033 (7th Cir. 1999) (citing *City of Canton v. Harris*, 489 U.S. 378, 391-92 (1989)) (mere negligence is not actionable under §1983); *see also Daniels v. Williams*, 474 U.S. 327, 332-335 (1986). Accordingly, Franklin is dismissed from this suit.

2.      **Qualified immunity**

Qualified immunity protects government officials from individual liability under §1983 for actions taken while performing discretionary functions, unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *Brokaw v. Mercer County*, 235 F.3d 1000, 1021 (7th Cir. 2000) (citing

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Thus, before liability will attach, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also United States v. Lanier*, 520 U.S. 259, 270, 117 S.Ct. 1219 (1997). The object of the "clearly established law" immunity standard is therefore akin to allowing officials fair warning that their actions are unconstitutional. *Lanier*, 520 U.S. at 270.

### a.   Waiver

As an initial matter, the court must first address Plaintiffs' contention that the State Defendants waived their defense of qualified immunity. The qualified immunity defense, like other affirmative defenses upon which the defendants bear the burden of proof, can be waived if the defendant either fails to raise the defense in a timely fashion or fails to raise it with sufficient particularity. *See, e.g. Walsh v. Mellas*, 837 F.2d 789, 799 (7th Cir. 1988); *McCardle v. Haddad*, 131 F.3d 43, 51 (2nd Cir. 1997). According to Plaintiffs, the State Defendants have waived their defense of qualified immunity because they failed to raise it with precision. (Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motions to Dismiss (hereinafter "Plaintiffs' Memo"), at 19.) Specifically, Plaintiffs claim that the State Defendants have misstated Plaintiffs' original complaint by saying that Plaintiffs challenge the use of the credible evidence standard at the investigation stage. (*Id.* at 19-20.) Instead, Plaintiffs contend that they are challenging the uses to which the State Defendants put a finding based on credible evidence:  disclosing the guilty finding to employers, stigmatizing indicated persons and foreclosing them from current employment. (*Id.* at 20.)

Plaintiffs therefore contend that, though Defendants present *a* qualified immunity defense, it is "not a defense that is even responsive to [P]laintiffs' credible evidence claim because it misstates it."

The court finds no merit in this argument. Whether Defendants misstated Plaintiffs' allegations, they clearly presented the defense of qualified immunity to this court. Indeed, the cases cited by Plaintiff lend no support to their argument that a defendant can waive the defense merely by misstating part of a plaintiff's claim. Instead, the cases show that qualified immunity is waived only in situations where Defendants did not raise it either in a timely manner or did not clearly present the defense to the court.

For example, in *Walsh v. Mellas*, 837 F.2d 789, 799 (7th Cir. 1988), the Seventh Circuit found that Defendants waived the defense of immunity because they raised the issue for the first time in the *second appeal* of the case. Similarly, in *McCardle v. Haddad*, 131 F.3d 43, 51-52 (2nd Cir. 1997), the court found that defendant had waived the defense of qualified immunity where the defendant could show no references to qualified immunity in his pretrial memorandum to the court, made no motion for summary judgment on the basis of qualified immunity, and made no mention of qualified immunity in his proposed jury instructions. *See also Blissett v. Coughlin*, 66 F.3d 531, 538 (2nd Cir. 1995) (where defendants raised qualified immunity in their answer but did not move for summary judgment on the ground of qualified immunity and qualified immunity was not the subject of any other pretrial motions, discovery or pretrial discussions with the court, the defense was waived); *Buffington v. Baltimore County*, 913 F.2d 113, 120-21 (4th Cir. 1990) (finding that defense of qualified

immunity was waived where defendant's brief merely stated that defendants were entitled to qualified immunity because, on the merits, there was no constitutional violation). In this case, unlike those where courts have found that the defense of qualified immunity was waived, the State Defendants have raised the defense in their motion to dismiss, thereby putting both the Plaintiffs and this court on notice of the defense. There is no similarity between this case and those where immunity was waived. The court will, therefore, address the merits of that defense.

### b. The Credible Evidence Standard

As has already been explained, qualified immunity is extended to all government officials performing discretionary functions as long as the officials' conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harrell v. Cook*, 169 F.3d 428, 431 (7th Cir. 1999) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Brokaw v. Mercer County*, 235 F.3d 1000 (7th Cir. 2000), the Seventh Circuit explained that to show a "clearly established" right:

> [A] plaintiff need not always identify a closely analogous case; rather, he can establish a clearly established constitutional right by showing that the violation was so obvious that a reasonable person would have known of the unconstitutionality of the conduct at issue. Thus, binding precedent is not necessary to clearly establish a right.

*Id.* at 1021.

Under this standard, the court must determine whether the two line investigators, McWilliams and Harrington, violated a clearly established right when they investigated the Plaintiffs, indicated the Plaintiffs as guilty of neglect based on a credible evidence standard,

and turned those findings over to their supervisors. The court must also determine whether the supervisors, Becerra, O'Leary and Everling, violated a clearly established right when they approved the findings of the investigators and allowed those findings to be placed in the State Central Register.[9] Finally, the court must determine whether McDonald and Cotton violated a clearly established right when they developed and maintained policy allowing for individuals to be indicated of abuse or neglect based only on a finding of credible evidence and allowed those reports to be placed in the State Central Register.

These State Defendants will be entitled to qualified immunity if Plaintiffs have failed to show that indicating a person and then placing that indicated finding in the State Central Register based only on the credible evidence standard violated clearly established law. Plaintiffs contend, however, at the time of the line investigators' and supervisors' actions, there was clearly established law holding that using the "credible evidence" standard to

---

[9]     As has been explained, there is no §1983 liability under a theory of respondeat superior. If the three supervisors were merely being sued in their supervisory capacity, this claim would be barred. Plaintiffs have alleged, however, that the supervisors took some affirmative actions in the decision to indicate Plaintiffs, including approving "the decisions of DCP investigators under their supervision," Cmplt. ¶¶ 16, 54, and issuing "instructions to enforce DCFS policy." *Id* ¶ 53. In addition, Becerrra signed McWilliams' indicated findings. *Id.* ¶ 54. Because, on a motion to dismiss, the court considers all the allegations in the complaint to be true and views all well pleaded facts and any reasonable inferences drawn from them in the light most favorable to the plaintiff, *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 675 (7th Cir. 2000), the court will assume that the investigators actively approved the decisions of DCP investigators, meaning they did some sort of independent review of the investigation or were actively involved in the decision to indicate Plaintiffs. *See Hebein ex rel. Berman v. Young*, 37 F. Supp. 2d 1035, 1046 (N.D. Ill. 1998) (though supervisor cannot be liable on a theory of *respondeat superior*, where it is alleged that the supervisor had knowledge of the same facts as the caseworker and joined in his decision, that supervisor can be liable based on her own personal involvement).

indicate a person of neglect or abuse was unconstitutional. Plaintiffs cite to three separate decisions, *Cavarretta v. Department of Children and Family Servs.*, 277 Ill. App. 3d 16, 660 N.E.2d 250 (2d Dist. 1996), *Valmonte v. Bane*, 18 F.3d 992 (2d Cir. 1994), and *Lee TT v. Dowling*, 87 N.Y.2d 699, 664 N.E.2d 1243 (1996), to support this argument.

In *Cavarretta*, 277 Ill. App. 3d at 28-29, 660 N.E.2d at 258, the Illinois Appellate Court found that the use of the "credible evidence" standard deprives a subject of due process. The court explained that such a standard may well be acceptable as a basis for investigating, just as the standard of probable cause supports an arrest. It is not, however, appropriate to use this standard as the basis for entering a final determination into the State Central Register, just as it would not be appropriate to convict a defendant based only on probable cause. *Id.* The court therefore determined that, before a person could be added to the State Central Register, "DCFS should at least be required to prove its case by a preponderance of the evidence." *Id.*

Similarly, the New York statutory scheme at issue in *Valmonte v. Bane*, 18 F.3d 992, 1004 (2nd Cir. 1994), directed that the names of persons indicated of abuse under merely a "credible evidence" standard be placed on the State Central Register. The Second Circuit concluded that practice a violated those individuals' right to due process. Instead, the court found that individuals should be placed on such a list only after they had been found guilty of abuse by a "preponderance of the evidence." *Id.* In *Lee TT*, 87 N.Y. 2d at 700, the Court of Appeals of New York, following the Second Circuit, found that, while there is no constitutional prohibition against the State maintaining a list of suspected abusers, the use of

the "credible evidence" standard to substantiate reports that are put on the State Central Register violates the protected liberty interest plaintiffs had in their present and future employment in the child care field. The court therefore held that the credible evidence standard is permissible at the investigative stage, but a report of abuse must be substantiated by a preponderance of the evidence before information concerning the subject may be disseminated to employers in child care agencies. *Id.* at 703, 711.

The court agrees with Plaintiffs that these three cases illustrate a trend towards rejecting the use of the credible evidence standard in cases of abuse and neglect and replacing it with a "preponderance of the evidence standard," at least before an indicated individual's name is added to the State Central Register. Nor does this court disagree with the findings in *Cavarretta, Lee TT,* and *Valmonte. See Dupuy v. McDonald*, No. 97 C 4199 slip op. (N.D. Ill. Mar. 30, 2001) (directing parties to agree to a process that will preclude use of credible evidence standard to indicate a finding against an individual, when such a finding is then disclosed to and used by employers and licensing representatives). The question before this court, however, is not whether the use of the credible evidence standard violated Plaintiffs' due process rights, but rather, whether that violation was clearly established at the time that the State Defendants acted. The court must answer this question in the negative.

To begin, Plaintiffs can cite to no binding precedent on this point. Both *Lee TT* and *Valmonte* are outside this jurisdiction and dealt with a New York statute. Thus, they cannot be said to put an official in Illinois on notice that use of the credible evidence standard was unconstitutional. *Cavarretta* presents a more persuasive argument that the Illinois DCFS

should have been on notice, but a single decision from a state appellate court critizing a well established DCFS procedure cannot be said to be "clearly established law" for purposes of defeating qualified immunity. The court therefore finds that the State Defendants did not violate clearly established law by their use of the credible evidence standard and, as such, are entitled to qualified immunity from this suit.

### E.    Claims Against Linda Everette-Williams

Finally, Plaintiffs have named Linda Everette-Williams, the Administrator of the State Central Register, in her individual capacity. As with a number of the named State Defendants, Plaintiffs do not allege any specific acts by Everette-Williams. They simply state that, as part of her position, she "records and maintains indicated reports . . . and initiates the appeals process from indicated reports, by sending to persons named as guilty . . . a notice that they have been found to have committed child abuse or neglect." (Cmplt ¶ 14.) She also "notes certain appeal rights" and is responsible for "issuing the notices of guilt findings that the Register employs." *Id.* The court will assume, by these allegations, that Plaintiffs have named Everette-Williams for failing to send Plaintiffs any formal notice of the indicated reports against them.

These allegations do not state a cognizable §1983 claim against Everette-Williams. Established DCFS policies required that Everette-Williams send Plaintiffs notice of their indicated reports, but she allegedly failed to do so. Plaintiffs do not allege, however, that she was anything but negligent in failing to send such notice. As has already been explained with regard to Defendant Franklin, under such allegations, Plaintiffs have not stated a cognizable

claim against Everette-Williams because mere negligence is not actionable under §1983. *See e.g., Pena v. Leombruni*, 200 F.3d 1031, 1033 (7th Cir. 1999) (citing *City of Canton v. Harris*, 489 U.S. 378, 391-92 (1989)) (mere negligence is not actionable under §1983); *see also Daniels v. Williams*, 474 U.S. 327, 332-335 (1986)(same). Accordingly, Everette-Williams is dismissed from this suit.

## CONCLUSION

For the foregoing reasons, State Defendants' and Defendant Camelot's motions to dismiss are granted.

ENTER:

Dated: March 30, 2001

REBECCA R. PALLMEYER
United States District Judge